UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HEALTHEDGE SOFTWARE, INC., | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * Civil Action No. 19-cv-11020-ADB |
| SHARP HEALTH PLAN, | * |
| | * |
| Defendant. | * |

# MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS

BURROUGHS, D.J.

Plaintiff HealthEdge Software, Inc. ("HealthEdge") seeks a declaratory judgment to establish that it did not breach its contractual obligations to Defendant Sharp Health Plan ("Sharp"). [ECF No. 1 ("Compl.")]. More specifically, HealthEdge asks the Court to enter a declaration that it: (1) did not breach the Software as a Service and Hosting Agreement ("SAAS"); (2) did not breach the second Statement of Work ("SOW-2"); and, (3) did not engage in misrepresentations or act fraudulently under the SAAS and SOW-2. [Compl. ¶¶ 25–32].

Before the Court is Defendant Sharp's motion to dismiss for lack of jurisdiction which seeks dismissal of the complaint based on a lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). [ECF No. 6 at 1]. For the following reasons, Sharp's motion to dismiss, [ECF No. 6], is <u>DENIED</u>.[1]

---

[1] Sharp's motion for a hearing on the motion to dismiss, [ECF No. 13], is therefore <u>DENIED</u> as moot.

## I. BACKGROUND

For purposes of this motion, the facts are drawn from the complaint and relevant documents,[2] and viewed in the light most favorable to the plaintiff. Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014). Plaintiff HealthEdge, a Delaware corporation with its principal place of business in Burlington, Massachusetts, [Compl. ¶ 1; ECF No. 9-1 ("Hughes Aff.") ¶ 4], develops and sells software products to health insurance providers, [Compl. ¶ 7; Hughes Aff. ¶ 5]. Defendant Sharp, a California corporation with its principal place of business in San Diego, California, [Compl. ¶ 2; ECF No. 6-1 ("Datko Decl.") ¶ 2], operates a health care service plan in California, [Compl. ¶ 8; Datko Decl. ¶ 2].

On October 1, 2014, Sharp submitted a Request for Proposal ("RFP") to nine health care software vendors across the country, including HealthEdge. [Datko Decl. ¶¶ 5–6; Hughes Aff. ¶ 7]. On November 3, 2014, HealthEdge responded to the RFP via email. [Id. ¶ 7; ECF No. 9-14]. The address of HealthEdge's Massachusetts headquarters was on the first page of the RFP response. [ECF No. 9-14 at 1]. The next page was signed by a HealthEdge executive with a Massachusetts address, [id. at 2], whose name and address were also listed under "Name of Contact Person," [id. at 5]. HealthEdge provided the same address under the heading "Name and Address of Company." [Id.]. The response also informed Sharp that HealthEdge's SAAS hardware and software was hosted in two data centers, one of which was located in Massachusetts, [id. at 11], and that "HealthEdge customer support is delivered from HealthEdge's company headquarters in Burlington, MA," [id. at 12].

---

[2] "A district court may . . . consider 'documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice." Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008) (quoting In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 20 (1st Cir. 2003)).

HealthEdge followed up on its response "for months with calls, emails, and other contacts between Sharp and HealthEdge personnel in Massachusetts," [ECF No. 9 at 1; Hughes Aff. ¶¶ 9–16], although Sharp avers that HealthEdge "vastly overstates" Sharp's contacts with HealthEdge's Massachusetts-based employees during this period. [ECF No. 12 at 3]. In January 2015, HealthEdge employees traveled to Sharp's headquarters in San Diego for an in-person demonstration of their software. [Datko Decl. ¶ 8; ECF No. 9-3 at 2].

After selecting HealthEdge's proposal, Sharp began negotiating a series of contracts with HealthEdge, primarily via email. [Datko Decl. ¶ 11; Hughes Aff. ¶14]. On September 1, 2015, a representative from HealthEdge traveled to Sharp's headquarters in San Diego for final contract negotiations. [Datko Decl. ¶ 12]. The two parties reached an agreement, with the contracts, including the SAAS and a Professional Services Agreement ("PSA"), becoming effective as of September 30, 2015. [Id.; Compl. ¶¶ 9–12]. HealthEdge's Chief Financial Officer electronically signed the contracts in Massachusetts on HealthEdge's behalf. [Hughes Aff. ¶ 21]. The first paragraph of both the SAAS and the PSA identified HealthEdge's principal place of business as Burlington, Massachusetts, [ECF No. 9-16 at 1; ECF 9-17 at 1], and both contracts required that any communications required or permitted under the contract were to be directed to HealthEdge's headquarters in Burlington, Massachusetts, [Hughes Aff. ¶¶ 22–23; ECF No. 9-16 at 13–14; ECF No. 9-17 at 11–12]. Sharp contends that neither of their two primary HealthEdge contacts during the negotiation period was based in Massachusetts, and that both travelled to California to negotiate the contracts. [Id.; ECF No. 12-1 ¶¶ 3, 5]. Further, no Sharp "employee ever traveled to Massachusetts related to the [Sharp]-HealthEdge contracts." [Datko Decl. ¶ 19].

HealthEdge provided professional services pursuant to the SAAS, PSA, and the statement of work identified as SOW-2, which included storing Sharp's data on HealthEdge servers in

Massachusetts, and Massachusetts-based employees resolving customer-service requests submitted on Sharp's behalf. [Hughes Aff. ¶¶ 26–32]. Sharp contends that customer service requests were submitted through an internet-based application, and that these "tickets" existed in the internet "cloud" rather than in Massachusetts. [ECF No. 12-1 ¶ 10]. Also, Sharp, at HealthEdge's instruction, initially mailed its payments to a P.O. Box address in Pittsburgh, Pennsylvania, and later wired payments to a bank in California. [Datko Decl. ¶ 14].

Throughout 2017, Sharp notified HealthEdge that it was dissatisfied with their performance under the contracts. [Datko Decl. ¶ 18]. On July 2, 2018, and September 7, 2018, Sharp sent HealthEdge letters addressed to HealthEdge's Massachusetts-based Chief Executive Officer, claiming that Healthedge had breached the terms of the SAAS and PSA/SOW-2, and that HealthEdge had misrepresented its products and services. [Compl. ¶¶ 21–22; ECF No. 9-12; ECF No. 9-19]. After efforts to resolve their dispute through informal discussions failed, the parties attended a mediation in San Diego, California on April 30, 2019, as required under the contracts.[3] [Datko Decl. ¶¶ 15, 18; ECF 9-16 at 14–15; ECF 9-17 at 11]. The mediation did not resolve the dispute and HealthEdge filed its declaratory relief action in this Court later that same day. [Compl. ¶ 23]. On May 18, 2019, Sharp filed a parallel action in the Superior Court of California, County of San Diego, alleging, inter alia, fraud pursuant to the California Civil Code, breach of contract, and violations of the California Business and Professions Code. [ECF No. 6-

---

[3] Both the SAAS and the PSA contained a dispute resolution clause which stipulated that, should informal discussions fail to lead to a resolution, the parties were required to submit to mediation "which shall occur exclusively in San Diego County, California." [ECF 9-16 at 14–15; ECF 9-17 at 11]. Both parties also agreed that, "[n]ot withstanding the foregoing, nothing herein shall prevent either party from seeking to obtain equitable or injunctive relief for any breach or threatened breach hereof." [ECF 9-16 at 15; ECF 9-17 at 11].

3 at 1]. On May 24, 2019, HealthEdge removed the California state case to the District Court for the Southern District of California. [ECF No. 6-4 at 3].

## II. LEGAL STANDARD

HealthEdge bears the burden of demonstrating that the Court may exercise personal jurisdiction over Sharp. See A Corp. v. All Am. Plumbing, Inc., 812 F.3d 54, 58 (1st Cir. 2016) (citing Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008)). "Under the prima facie standard, plaintiffs must proffer 'evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction.'" Packs v. Bartle, No. 18-cv-11496, 2019 WL 1060972, at *3 (D. Mass. Mar. 6, 2019) (quoting A Corp., 812 F.3d at 58). "[P]laintiffs may not rely on unsupported allegations in their pleadings," and are "obliged to adduce evidence of specific facts . . . ." Platten v. HG Berm. Exempted Ltd., 437 F.3d 118, 134 (1st Cir. 2006) (first quoting Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992), then quoting Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995)). "The Court takes as true whatever properly documented facts plaintiffs proffer, construes those facts in the light most favorable to the plaintiffs, and considers facts put forward by defendants to the extent they are uncontradicted." Packs, 2019 WL 1060972, at *3 (citing Phillips, 530 F.3d at 26; Platten, 437 F.3d at 134).

Personal jurisdiction may be based on either general jurisdiction or specific jurisdiction. See Harlow v. Children's Hosp., 432 F.3d 50, 57 (1st Cir. 2005) ("The plaintiff need not prove the existence of both types of [personal] jurisdiction; either one, standing alone, is sufficient." (citing Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998)). Because Sharp is a California corporation with its principal place of business in

5

California and HealthEdge does not assert that Sharp is subject to general jurisdiction in Massachusetts, the Court considers only whether it has specific personal jurisdiction.

## III. DISCUSSION

"In determining whether a non-resident defendant is subject to its jurisdiction, a federal court exercising diversity jurisdiction 'is the functional equivalent of a state court sitting in the forum state.'" Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 51 (1st Cir. 2002) (quoting Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995)). "The Due Process Clause of the Fourteenth Amendment allows a state court to exercise jurisdiction over a non[-]resident only where the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" Packs, 2019 WL 1060972, at *3 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). Thus, "[t]o establish personal jurisdiction in a diversity case, a plaintiff must satisfy both the forum state's long-arm statute and the Due Process Clause of the Fourteenth Amendment." C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 65 (1st Cir. 2014) (citing Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 204 (1st Cir. 1994)). See also Pritzker v. Yari, 42 F.3d 53, 60 (1st Cir. 1994) ("The proper exercise of specific [personal] jurisdiction hinges on satisfaction of two requirements: first, that the forum in which the federal district court sits has a long-arm statute that purports to grant jurisdiction over the defendant; and second, that the exercise of jurisdiction pursuant to that statute comports with [due process]").

### A. Jurisdiction Pursuant to Massachusetts' Long-Arm Statute

"Massachusetts's long-arm statute, [Mass. Gen. Laws ch.] 223A, § 3, provides that '[a] court may exercise personal jurisdiction over a person . . . as to a cause of action in law or equity arising from the person's one or more specific acts or omissions, as enumerated in the statute." SCVNGR, Inc. v. Punchh, Inc., 85 N.E.3d 50, 54–55 (Mass. 2017). "For jurisdiction to exist under § 3(a) . . . the defendant must have transacted business in Massachusetts, and the plaintiff's claim must have arisen from the transaction of business by the defendant." Exxon Mobil Corp. v. Att'y Gen., 94 N.E.3d 786, 793 (Mass. 2018) (citing Tatro v. Manor Care, Inc., 625 N.E.2d 549, 551 (Mass. 1994)).

The requirements of § 3(a) are construed broadly. Exxon Mobil, 94 N.E.3d at 793. "Although an isolated (and minor) transaction with a Massachusetts resident may be insufficient, generally the purposeful . . . solicitation of business from residents of the Commonwealth, by a defendant or its agent, will suffice to satisfy this requirement." Tatro, 625 N.E.2d at 551–52 (internal citations omitted). "[T]he defendant's involvement need not be major, as 'just a few acts on [his] part can often suffice to satisfy [§ 3(a)'s] threshold for transacting business.'" Scuderi Grp., LLC v. LGD Tech., LLC, 575 F. Supp. 2d 312, 319 (D. Mass. 2008) (quoting Workgroup Tech. Corp. v. MGM Grand Hotel, LLC, 246 F. Supp. 2d 102, 110 (D. Mass. 2003)). See, e.g., Hahn v. Vermont Law Sch., 698 F.2d 48, 51 (1st Cir. 1983) (holding that law school's mailing of application information and acceptance letter to Massachusetts resident was sufficient to satisfy § 3(a)).

"The 'arising from' clause in [the long-arm statute] is . . . generously construed in favor of asserting personal jurisdiction, by applying a 'but for' causation test." Packs, 2019 WL 1060972, at *3 (quoting Workgroup Tech, 246 F. Supp. 2d at 112). The inquiry asks only

7

whether "the defendant's contacts with the Commonwealth constitute the first step in a train of events that result[ed] in the [relevant] injury." Lyle Richards Int'l, Ltd. v. Ashworth, Inc., 132 F.3d 111, 114 (1st Cir. 1997) (first alteration in original) (quoting Tatro, 625 N.E.2d at 553). "[A] claim arises from a defendant's transaction of business in the forum State if the claim was made possible by, or lies in the wake of, the transaction of business in the forum State." Access Now, Inc. v. Otter Prods., LLC, 280 F. Supp. 3d 287, 291 (D. Mass. 2017) (citation omitted).

The parties agree that Sharp submitted an RFP to nine health care software vendors across the country, including HealthEdge in Massachusetts. [Datko Decl. ¶¶ 5–6; Hughes Aff. ¶ 7]. In its response to Sharp's RFP, "HealthEdge identified itself as a Massachusetts-based company and listed a contact person with a Massachusetts address. HealthEdge also informed Sharp that it would provide customer service out of Massachusetts, and that it may host Sharp's data in Massachusetts." [ECF No. 9 at 1]. Sharp then entered into agreements that identified HealthEdge's principal place of business as being in Burlington, Massachusetts, and required that any communications under the contract be directed to HealthEdge's headquarters in Burlington, Massachusetts. [Hughes Aff. ¶¶ 22–23]. Sharp therefore solicited Massachusetts residents to provide it with services and transacted business in Massachusetts. See Tatro, 625 N.E.2d at 551–52 ("[S]olicitation of business from residents of the Commonwealth, by a defendant or its agent, will suffice to satisfy [the 'transacted business'] requirement.").

Further, once the parties agreed to the contracts, HealthEdge stored Sharp's data on HealthEdge servers in Massachusetts, and Massachusetts-based HealthEdge employees resolved customer service requests submitted on Sharp's behalf. [Hughes Aff. ¶¶ 26–32]. In addition to the solicitation of HealthEdge's business, Sharp's ongoing business relationship with a Massachusetts-based company "satisfy[ies] [§ 3(a)'s] threshold for transacting business."

8

Scuderi Grp., LLC, 575 F. Supp. 2d at 319. Accordingly, HealthEdge's claims fall within the "broad" construct of Chapter 223A § 3(a). See Exxon Mobil, 94 N.E.3d at 793.

**B.    Personal Jurisdiction Consistent with Due Process**

"[D]ue process requires only that in order to subject a defendant to a judgment *in personam*, . . . he have certain minimum contacts with [the forum] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." Daynard, 290 F.3d at 52 (first alteration in original) (internal quotation marks omitted) (quoting Int'l Shoe, 326 U.S. at 316). "The First Circuit has 'broken the minimum contacts analysis into three categories—relatedness, purposeful availment, and reasonableness.'" Packs, 2019 WL 1060972, at *6 (quoting Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir. 2007)); see also Daynard, 290 F.3d at 60.

1.    Relatedness

To satisfy the relatedness requirement, "the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities." Foster-Miller, Inc., 46 F.3d at 144 (quoting United Elec., Radio, and Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1089 (1st Cir. 1992)). "The relatedness standard is a 'flexible, relaxed standard,' which focuses on the 'nexus between the defendant's contacts and the plaintiff's cause of action.'" Adelson, 510 F.3d at 49 (first quoting Pritzker 42 F.3d at 61, then quoting Ticketmaster-New York, Inc., 26 F.3d at 206).

"The relatedness requirement is not met merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, the action must directly arise out of the specific contacts between the defendant and the forum state." Sawtelle, 70 F.3d at 1389. Thus,

9

even if the "effects of the alleged breach were felt in Massachusetts," a plaintiff must demonstrate that the "breach itself occurred in this state." Platten, 437 F.3d at 138.

In contract disputes, "even minor contacts with the forum state can satisfy the relatedness test if those contacts were related to the contract claims . . . ." Shelton Bros., Inc. v. Three Pirates, LLC, No. 15-cv-30140, 2017 WL 1227922, at *4 (D. Mass. Mar. 31, 2017). Sharp contends that the relatedness prong is not satisfied because it never "physically entered Massachusetts in order to fulfill its obligations" and did not "sen[d] its payments to Massachusetts." Id. Personal jurisdiction "may not be avoided merely because the defendant did not physically enter the forum state." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985). Sharp "had an ongoing connection with Massachusetts in the performance under the contract. [Sharp's] claims arise from the alleged breach of that contract. That is enough to establish relatedness." C.W. Downer, 771 F.3d at 66.

More specifically, Sharp entered into contracts with a Massachusetts-based company, was made aware that its data would be hosted in Massachusetts, and that HealthEdge would be providing customer service from Massachusetts. [Hughes Aff. ¶¶ 26–32]. When Sharp was unsatisfied with HealthEdge's performance, it twice mailed letters to HealthEdge's Massachusetts headquarters. [Compl. ¶¶ 21–22; ECF No. 9-12; ECF No. 9-19]. HealthEdge's claims are thus related to the provision of services which were performed, at least partially, in Massachusetts. Therefore, HealthEdge has met its burden of showing that Sharp's "in-state conduct . . . form[ed] an important, or [at least] material, element of proof" in its case. Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 289 (1st Cir. 1999) (internal quotation marks omitted) (quoting United Elec. Workers, 960 F.2d at 1089).

## 2. Purposeful Availment

Next, "the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." Daynard, 290 F.3d at 61 (citation omitted). The purposeful availment "requirement ensures that jurisdiction is not based on merely random, isolated or fortuitous contacts" with Massachusetts. Adelson, 510 F.3d at 50 (internal quotation marks and citations omitted).

Voluntariness and foreseeability are the main considerations in assessing purposeful availment. Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 36 (1st Cir. 2016). In order to satisfy the voluntariness requirement, a defendant's forum contacts must be the result of the defendant's own, voluntary actions. Id. "Foreseeability requires that the contacts with the forum state be of a nature that the defendant could 'reasonably anticipate being haled into court there.'" Adams v. Adams, 601 F.3d 1, 6 (1st Cir. 2010) (quoting Adelson, 510 F.3d at 50).

"[A] defendant's awareness of the plaintiff's state of residence is not, by itself, enough to create personal jurisdiction," nor does "a defendant's entering into a contract with a resident of the forum state . . . automatically establish minimum contacts." Id. at 7. The court must look to the parties' negotiations and the expected consequences, the terms of their contract, and their actual course of dealing to determine whether the defendant's contacts with the forum made it foreseeable that the defendant might have to face litigation in the forum state. See id.

Sharp purposefully availed itself of the privilege of conducting activities in Massachusetts by soliciting an in-forum provider of software services for health insurance

11

companies. [Datko Decl. ¶¶ 5–6]. Through HealthEdge's RFP response, Sharp was made aware that its data would be hosted in Massachusetts, and that HealthEdge would be providing customer service from Massachusetts. [Hughes Aff. ¶¶ 26–32]. Accordingly, Sharp's "involuntary presence before the state's courts [is] foreseeable," Daynard, 290 F.3d at 61, and not based on "random, isolated, or fortuitous contacts with the forum state," A Corp., 812 F.3d at 60 (quoting Sawtelle, 70 F.3d at 1391).

Sharp contends that, as a health plan operating only in California, it could not have reasonably foreseen being sued in Massachusetts under the contracts, which include a clause that any dispute must be mediated in California. [ECF No. 6 at 14]. Although it is true that the relevant contracts in this case included detailed procedures to resolve the parties' disputes in California, where they would be governed by California law, [Datko Decl. ¶ 15], the dispute resolution clauses also stipulate that, "nothing herein shall prevent either party from seeking to obtain equitable or injunctive relief for any breach or threatened breach hereof." [ECF 9-16 at 15; ECF 9-17 at 11]. Therefore, the contracts do not prevent the Court from exercising personal jurisdiction over Sharp in this case nor do they make litigation in Massachusetts unforeseeable to Sharp.

### 3. Reasonableness

Finally, it must be reasonable for the Court to exercise jurisdiction over an out-of-state defendant. Packs, 2019 WL 1060972, at *6. The First Circuit has identified the following "Gestalt factors" to guide the reasonableness inquiry: "(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting

substantive social policies." Pritzker, 42 F.3d at 63–64 (quoting United Elec.Workers, 960 F.2d at 1088).

As to the first factor, defending an action "in a foreign jurisdiction is almost always inconvenient and/or costly, . . . [and] this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." Pritzker, 42 F.3d at 64. But, "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." Plixer Int'l, Inc. v. Scrutinizer GmbH, 905 F.3d 1, 13 (1st Cir. 2018) (quoting Asahi Metal Indus. Co. v. Super. Ct. of Cal., 480 U.S. 102, 114 (1987)). Sharp has failed to argue that there would be any kind of special or unusual burden for it to appear in this jurisdiction. This factor does not meaningfully undermine the reasonableness of exercising personal jurisdiction over Sharp in this case. See Pritzker, 42 F.3d at 64 (noting that "[i]n the modern era, the need to travel . . . creates no especially ponderous burden"). The Court finds that the burden on Sharp would not be significant.

The second factor, Massachusetts' interest in hearing the suit, also weighs toward exercising personal jurisdiction. "As the Supreme Court has explained, '[a] State generally has a "manifest interest" in providing its resident[s] with a convenient forum for redressing injuries inflicted by out-of-state actors.'" Baskin-Robbins, 825 F.3d at 40 (quoting Burger King Corp., 471 U.S. at 473). The First Circuit has indicated that "[t]he purpose of [this] inquiry is not to compare the forum's interest to that of some other jurisdiction, but to determine the extent to which the forum has an interest." Foster-Miller, 46 F.3d at 151. Here, the Commonwealth's interest in providing HealthEdge, a Massachusetts-based company, with a convenient forum to bring its claims against Sharp supports the Court's exercise of personal jurisdiction. See N.

13

Light Tech. v. N. Lights Club, 97 F. Supp. 2d 96, 107 (D. Mass. 2000) (finding that Massachusetts' interest in hearing the suit weighed in favor of the plaintiff, who was located in Massachusetts).

The third factor, the plaintiff's convenience, likewise favors HealthEdge. "[A] plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience." Sawtelle, 70 F.3d at 1395. While certain key witnesses may be located in California, many of the witnesses and much of the evidence will be located in Massachusetts, supporting the general presumption of favoring the plaintiff's forum selection.

The fourth factor, the judicial system's interest in obtaining the most effective resolution of the controversy, is neutral. This factor considers whether the Court's intervention would provide efficient or effective relief, and is here "a wash" in that either California or Massachusetts could effectively litigate the dispute. Nowak v. Tak How Investments, Ltd., 94 F.3d 708, 718 (1st Cir. 1996). This Court has "no corner on the market" on effectively administering justice. Baskin-Robbins, 825 F.3d at 41.

The fifth factor concerns the social policy considerations of exercising personal jurisdiction and weighs toward the exercise of personal jurisdiction. "Massachusetts has an interest in protecting its citizens from out-of-state [corporations] . . . as well as affording its citizens a convenient forum in which to bring their claim." Nowak, 94 F.3d at 719. The fact that Massachusetts will have to apply California law in its interpretation of the underlying contract does not make the factor automatically favor Sharp. "A federal court sitting in Massachusetts is fully capable of applying [California] law. Equally as important, [California]'s interest in the matter does not trump Massachusetts' interest." Baskin-Robbins, 825 F.3d at 41 (internal

14

citations omitted). Taken in total, the Gestalt factors support the exercise of personal jurisdiction over Sharp in this case.

## IV. CONCLUSION

Accordingly, Sharp's motion to dismiss, [ECF No. 6], is <u>DENIED</u>. HealthEdge has demonstrated that the Court may exercise personal jurisdiction over Sharp consistent with both due process and the Massachusetts long-arm statute. Sharp's motion for a hearing, [ECF No. 13], is <u>DENIED</u> as moot.

**SO ORDERED.**

March 19, 2020 /s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE